[Civ. No. 6774. Fourth Dist. Aug. 20, 1962.]

F. W. GRUNER, Plaintiff and Respondent, v. WALTER H. BARBER, Defendant and Appellant.

W. E. Starke for Defendant and Appellant.

Holliday, Folsom & Winters and David S. Folsom for Plaintiff and Respondent.

GRIFFIN, P. J.—Plaintiff-respondent Gruner brought this action against defendant-appellant Barber for damages for trespass. The court granted plaintiff $650 compensatory damages and $1,500 punitive damages. Plaintiff owned real property located on both sides of a 40-foot public road in San Diego County. Early in 1960, the defendant constructed a sewer line along this road past plaintiff's property, under contract with the county. This job took about two months. Plaintiff testified that during this period of time defendant's workmen tore down or damaged his fence daily and allowed his horse to escape on several occasions; that defendant's employees took certain timbers valued at $50 and used them in their work; that they also took 100 cubic yards of dirt from plaintiff's property and this dirt was valued at $100. Plaintiff estimated that he and his family did $500 worth of work and labor repairing the fence and restoring it; that during the

period of construction, plaintiff, his wife and some of his neighbors objected to the conduct of defendant's workmen but were never able to deter their activities. The court found that the acts were done with malice and with a willful and wanton disregard of plaintiff's rights, and accordingly awarded exemplary damages.

Defendant, who was on the job about 30 minutes each day, and his job foreman generally contradicted all the testimony offered by plaintiff. Defendant, on this appeal, claims (1) that the trial judge was biased and prejudiced; (2) that the plaintiff and his witnesses did not tell the truth; (3) that the evidence was insufficient; and (4) that the defendant performed his contract according to the plans and specifications furnished by the public agency which employed him and therefore is immune to suit for damage resulting from the construction of the public improvement.

## BIAS OF TRIAL JUDGE

The basis of this claim is not clear. Possibly the argument is that the trial judge was prejudiced generally against all contractors. This claim appears to be raised for the first time on appeal in defendant's brief, and is predicated on a statement there made that the trial judge was biased or prejudiced "stemming from the case of *Jepsen* v. *Sherry*, reported at 99 Cal.App.2d 119 [220 P.2d 819, 822] which was predicated upon certain remarks the trial judge made in orally announcing his findings and judgment:

"Punitive damages also are imposed for the purpose of setting an example to others, and in this case, as the defendant is a contractor, by inflicting punishment on him, here, and by way of punitive damages, it might also have the effect of preventing further depredations on the property of individuals. A person should not proceed under the theory that they may with impunity, and with almost a wanton disregard for the rights of others, invade the property of others, because it might be convenient to them, in the conduct of their business affairs."

There is no showing that any such claim of bias or prejudice was made prior to the trial under Code of Civil Procedure, section 170, and there is no indication that a challenge against the trial judge was interposed under Code of Civil Procedure, section 170.6. (*Michaels* v. *Superior Court*, 184 Cal.App.2d 820 [7 Cal.Rptr. 858].) The *Jepsen* case cited does not establish, as a matter of fact or law, that the judge was biased against defendant in the instant action.

## Veracity of Witnesses

Defendant complains because the trial judge believed the testimony of plaintiff and his witnesses as opposed to that of defendant and his witnesses. The argument is that certain photographs in evidence contradicted plaintiff's testimony regarding certain physical facts reflected therein, such as boulders which were shown to be on plaintiff's land and were claimed to have been placed there by defendant's operations, when certain grass growing between them indicated they were there before defendant started his operations; that plaintiff testified that certain debris was shown on his property, and claimed to be reflected in a photograph taken after the completion of the operation, when, in fact, the photograph shows the ditch to be still open; that if plaintiff's fence was down as often as he claimed (daily), he would have made earlier complaint to defendant than he did (Defendant claimed that the only time the fence was down was when the utility company repaired a nearby pole.) ; and that in fact, according to defendant's testimony, only four of plaintiff's timbers were used, and they were used by an independent contractor on the job.

■ It should be here noted that the trial judge did give judgment in favor of plaintiff for the approximate amount plaintiff claimed he was damaged in reference to the items indicated. The one item of damage for $500 for services performed by plaintiff and his children in repairing the fence and recovering the horse is not itemized as to time, extent or occasion. A mere reading of the transcript might well appear to cast considerable doubt as to the amount claimed due. Also, the claim that the fence was knocked down daily and daily repaired by plaintiff is open to some doubt, but plaintiff so testified and the trial court apparently believed his testimony. ■■ We find ourselves immediately presented with the oft-repeated and time-honored rule that when a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, that will support the finding, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. (*Brewer* v. *Simpson*, 53 Cal.2d 567 [2 Cal.Rptr. 609, 349 P.2d 289].)

The amount of punitive damages awarded might well appear to us, from the evidence produced, to be somewhat unreasonable, but, here again, we are confronted with the same rule.

Plaintiff did testify that the fence was broken down daily and there is some corroboration of this fact in that it was broken down on several occasions when neighbors went by that operation. There is testimony that plaintiff first discussed this fence problem with defendant over the telephone the first .week defendant worked there, and complained about it and about the horse's getting out and told defendant that he would like defendant and his men to respect his property. He testified that defendant told him that he would send his foreman to see him about it, but he failed to do so; that about 10 days later, he went to see the foreman and asked about the timbers they were taking and the foreman told him that he would see that the timbers were taken back; that he told the foreman to use the gate and not tear down his fence; that the foreman said he could not be there all the time but that he would keep after his men about it and that was about the end of it, but the fence was continually torn down daily and was left down after the workmen finished the job; that the horse got out on several occasions and it was worth $500 of his time, and that of his children, to catch the horse and repair the fence over that period of time; that it was necessary for him to put in approximately a dozen or two dozen new posts at a cost of about 60 cents apiece.

Mrs. Gruner testified that she worked, but was home Wednesday afternoons and at lunch time, and that she saw employees of defendant remove timber from her property and when she asked them to stop taking it they said to call Mr. Barber; that she called defendant and his son said his father was ill and that they would take care of it; that one week later they started taking her timber again and she called the son; that the son said his father was ill; that the son came out to see her and told her again that he would take care of it. She testified that she could not tell whether other timber was taken thereafter. She then testified that on one occasion she saw defendant's workmen taking down the fence to let a tractor through and the horse got out and she complained "all the time" about that, and defendant always said he would take care of it, but it continued; that she saw defendant's employees removing certain dirt from their property to fill the ditch; that she went down and asked them to stop but

they did not do so and she complained to defendant, and finally they came out and tried to put it back as it was before but it was not satisfactory.

Plaintiff's daughter testified that she never saw defendant tear down the fence, but she did catch the horse and return it to the pasture on three different occasions. She testified that she knew it was defendant's equipment working there because she saw his name on the equipment.

An award of exemplary or punitive damages depends on a definite showing of a willingness to vex, harass or injure, consistent with a wrongful personal intent to injure. The wrongful personal intention to injure is the factor that calls forth the penalty, for, although the defendant's wrongful act can be fully compensated by compensatory damages, his improper motive for performing the wrongful act in question may properly be punished by exemplary or punitive damages. The motive or intent is important in determining whether or not such damages should be allowed to the plaintiff. (14 Cal. Jur.2d § 175, p. 809; *Davis* v. *Hearst,* 160 Cal. 143 [116 P. 530]; *Wolfsen* v. *Hathaway,* 32 Cal.2d 632 [198 P.2d 1]; *Lyon* v. *Hancock,* 35 Cal. 372.) Consequently, in every case in which an award of exemplary or punitive damages is made, the defendant's improper or evil motive must be made to appear by means of the element of malice. (*Fidelity Appraisal Co.* v. *Federal Appraisal Co.,* 217 Cal. 307 [18 P.2d 950].) From plaintiff's evidence, which the trial court apparently believed, it might be rightfully inferred that these elements had been established and the court so found.

### CLAIMED IMMUNITY

Lastly, immunity is claimed by defendant because he performed his contract according to the plans and specifications furnished by the public agency employing him. (Citing such authority as *Los Angeles Dredging Co.* v. *Long Beach,* 210 Cal. 348, 357 [291 P. 839, 71 A.L.R. 161]; *De Baker* v. *Southern Cal. Ry. Co.,* 106 Cal. 257, 284 [39 P. 610, 46 Am. St.Rep. 237]; *Steiger* v. *City of San Diego,* 163 Cal.App.2d 110 [329 P.2d 94]; 43 Am.Jur. § 83, pp. 827-828.)

The general rule indicated by the cases relied upon clearly shows that: "One who contracts with a public body for the performance of public work is entitled to share the immunity of the public from liability for incidental injuries necessarily involved in performance of the contract, where he is not guilty of negligence. However, whatever immunity

the state or its political subdivisions may enjoy from liability for negligence does not extend to injuries proximately resulting from the contractor's negligence in performance of the work contracted for." (41 Cal.Jur.2d § 43, pp. 425-426.) (See also *Gay* v. *Engebretsen,* 158 Cal. 21 [109 P. 876, 139 Am.St. Rep. 67] ; *County of Alameda* v. *Tieslau,* 44 Cal.App. 332 [186 P. 398] ; *Hamilton* v. *Harkins,* 146 Cal.App.2d 566 [304 P.2d 82].)

 There is no showing that the plans and specifications furnished by the county indicated that the contractor should tear down fences, or damage, appropriate, or use the property of others in connection with the work. The actions taken by defendant, as found by the court, indicate a willful personal appropriation of property for the benefit of the contractor, and indicate a negligent act or willful tort in tearing down the fence, not provided for by the contract. Under the evidence and findings, the claimed immunity would not be applicable. (*Wiersma* v. *City of Long Beach,* 41 Cal.App.2d 8, 13 [106 P.2d 45].)

Judgment affirmed.

Shepard, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 17, 1962.